******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* KRISTOPHER JOSEPH PRUDHOMME
## (AC 43302)

Moll, Clark and Sheldon, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree, cruelty to persons and tampering with physical evidence, the defendant appealed to this court. He claimed that the trial court's jury instructions deprived him of his right to due process and a fair trial because they could have misled the jurors into thinking they could not consider inadequacies in the police investigation in evaluating whether the state had proved him guilty beyond a reasonable doubt. The complainant, L, and the defendant shared an apartment. After they returned to the apartment with M, the defendant's girlfriend, in the early morning hours after visiting a club, L told the defendant that he had twice slept with M. In the early evening of that same day, the defendant found L passed out in his room, covered in vomit and urine, with a red ring around his neck. The defendant told the 911 dispatcher that L had attempted suicide. The police found L on the floor of his bedroom. Although the police searched the apartment for anything that could have caused the red marks on L's neck, they did not enter or search the defendant's separate bedroom. One of the police officers who searched the apartment, relying in part on the defendant's statements, believed that L had attempted suicide and sought to have him seen by a psychologist after L was taken to a hospital. After L's mother reported to the police that, when L had awoken from a coma he was in at the hospital, he told her that the defendant had attempted to strangle him, the police interviewed the defendant, who changed his story and told them for the first time both that he had a form of autism and that L had told him about having had sex with M. The defendant's theory of defense was that the police conducted an inadequate investigation in that, inter alia, they failed to sufficiently document the injuries to L's neck, they failed to interview L or his mother about the allegation that the defendant strangled him, they failed to analyze certain evidentiary inconsistencies, and they never considered that the defendant's autism could explain his behavior or inconsistent statements to paramedics and the police when they responded to his 911 call. The defendant filed a request to charge the jury in which he sought, in part, to have the jury instructed to consider the completeness or incompleteness of the police investigation and whether evidence concerning the adequacy of the investigation affected the reliability of the evidence and the credibility of witnesses. After conducting a charging conference with counsel, the court declined to instruct the jury in accordance with that portion of the defendant's request and instead instructed the jury in accordance with the model investigative inadequacy instruction on the Judicial Branch website at that time. *Held*:

1. The trial court's jury instruction on the adequacy of the police investigation was erroneous, as there was a reasonable possibility that it misled the jury and, thus, prejudiced the defendant:

a. The trial court failed to inform the jury of the defendant's right to have it consider the inadequacy of the police investigation in evaluating whether the state had proved him guilty beyond a reasonable doubt: because the court noted during the charge conference that there was a factual dispute as to the adequacy of the investigation, the defendant was entitled to have the jury consider evidence of any relevant deficiencies or lapses in the investigation as bases for entertaining reasonable doubt as to his guilt; moreover, had language been added to the court's charge of the sort the defendant requested, the jury would have been apprised of his right to present an investigative inadequacy defense and the jury's right to consider it in evaluating the strength of the state's case.

b. Because the trial court's instructional error prejudiced the defendant and was not harmless beyond a reasonable doubt, he was entitled to a new trial, there having been a reasonable possibility that the error affected the verdict: the jury may have ignored key evidence as to the adequacy

of the police investigation, as there was a significant risk that it was misled to believe that it could not consider the defendant's arguments as to the investigation, and it was apparent that the instructional error was harmful given the relative weakness of the state's case, which turned almost entirely on the believability of L's allegation that the defendant strangled him, even though L did not see the defendant attempt to do so; moreover, defense counsel adduced evidence that tended to undermine L's credibility, elicited testimony that there were alternative explanations for L's neck injuries and argued that any inconsistencies in the defendant's statements or mannerisms could be explained by his autism; furthermore, the state did not prove beyond a reasonable doubt that a properly instructed jury would not have entertained a reasonable doubt as to the defendant's guilt and, thus, find him not guilty on the basis of the alleged deficiencies in the police investigation.

2. The trial court improperly admitted into evidence a police disciplinary report in violation of the defendant's state and federal constitutional rights to confront witnesses against him: contrary to the court's determination that the state offered the report to show that the police department had taken action with regard to the performance of an officer during the investigation, the report was introduced to prove the truth of its contents, which were that the officer's investigation and conclusion that L had attempted suicide were inadequate and unsatisfactory; moreover, the report was inadmissible under the business records exception (§ 52-180) to the rule against hearsay, as the state failed to establish that it was made in the regular course of business, and, because the report was made three months after the actions it described, it did not have the indicia of trustworthiness required to fall within the business records exception; furthermore, the report was testimonial in nature, the statements in it having been made under circumstances that would lead an objective witness reasonably to believe that the report would be available for use at a later trial, and the state did not introduce evidence that the officer who prepared the report was unavailable to testify at trial or that the defendant had a prior opportunity to cross-examine him.

Argued October 13, 2021—officially released January 25, 2022

*Procedural History*

Substitute information charging the defendant with two counts of the crime of assault in the first degree, and with one count each of the crimes of assault in the second degree, strangulation in the first degree, cruelty to persons and tampering with physical evidence, brought to the Superior Court in the judicial district of New London and tried to the jury before *Jongbloed, J.*; thereafter, the court denied the defendant's motions to preclude certain evidence and to strike certain testimony; verdict of guilty of one count of assault in the first degree, and of cruelty to persons and tampering with physical evidence; subsequently, the court dismissed the charge of assault in the second degree, denied the defendant's motion for a new trial and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Reversed*; *new trial*.

*Andrew P. O'Shea*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, deputy assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Stephen M. Carney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Kristopher Joseph Prudhomme, appeals from the judgment of conviction, rendered after a jury trial, of charges of assault in the first degree in violation of General Statutes § 53a-59 (a) (3), cruelty to persons in violation of General Statutes § 53-20 (a) (1), and tampering with evidence in violation of General Statutes § 53a-155. On appeal, the defendant claims that the trial court improperly (1) failed to instruct the jury that it properly could consider evidence of inadequacies in the police investigation that led to his arrest and prosecution as a basis for discrediting the state's evidence against him and entertaining reasonable doubt as to his guilt, (2) admitted into evidence, over his objection, a police disciplinary report containing hearsay statements from nontestifying police officers that tended to undermine his theory of defense, and (3) denied his motion for a new trial pursuant to his claim that the jury's verdict was against the manifest weight of the evidence.[1] We agree with the defendant's first claim of error, and accordingly, on that basis, reverse the judgment of conviction of all charges and remand this case for a new trial thereon. We also agree with the defendant's second claim of error, which we have reviewed because it is likely to arise again at retrial. We do not reach the defendant's third claim of error because it is unnecessary for the ultimate disposition of this appeal.

The jury was presented with the following evidence on which to base its verdict. In the autumn of 2016, the complainant, Michael Lovering, moved from Louisiana to Connecticut. On October 1 of that year, on the invitation of the defendant, Lovering became the defendant's roommate in an apartment in Norwich. Having first met the defendant, a fellow participant in the Goth culture, when they worked together as disc jockeys, Lovering had known the defendant for eight years by the time they became roommates in the Norwich apartment.

On the night of October 21, 2016, the defendant, Lovering, and the defendant's girlfriend, Lauren Muskus, went to see a band play at a club in New Haven. Lovering consumed alcohol while at the club, then got into an altercation with the mother of an underage girl. Following the altercation, Lovering left the club, intending to walk home. Shortly thereafter, however, he was picked up by the defendant and Muskus, who drove him back to Norwich.

Upon arriving back at the apartment, sometime after 2:30 a.m. on October 22, 2016, Lovering saw his neighbors, Chandler Gottshall and her boyfriend, outside the apartment and invited them inside. The group initially talked and drank alcohol for a while in the kitchen of the apartment. During that time, Gottshall noticed that Lovering appeared to be intoxicated, as he was slurring

his speech, stumbling when he walked, and, at one point, fell over and struck the stove. Later, according to Gottshall, the mood of the gathering changed after Lovering and the defendant went into the defendant's room and had a short conversation in which Lovering told the defendant that he had slept with Muskus on two separate occasions. Gottshall testified that, when Lovering returned to the kitchen after having that conversation, he pulled her and her boyfriend outside. Lovering told them what he had told the defendant about sleeping with Muskus, then told them that they should leave, which they promptly did. Gottshall testified that, after Lovering spoke with the defendant, Lovering "was very upset about it, just talking about it . . . ."

Later in the day on October 22, at approximately 5:30 p.m., the defendant called 911 and requested that an ambulance be sent to his residence. The defendant told the police dispatcher during the call that he had just found Lovering in his room, passed out and covered in vomit and urine. During the call, the defendant further stated that Lovering was barely conscious, completely incoherent, and continuing to vomit. The defendant also informed the dispatcher that Lovering had "a red ring around his neck." He concluded the call by telling the dispatcher, "[I]t's a suicide attempt."

Officer Jared Homand of the Norwich Police Department was dispatched to the defendant's residence in response to the 911 call. When Homand arrived, he was met by the defendant at the front door. The defendant told the officer that he had found Lovering in his room, incapacitated, after hearing him groaning and going in to check on him. Homand then entered the residence, accompanied by the defendant, and found Lovering lying on the floor of his bedroom with his legs tucked up under his body as if he had knelt down on the floor and lain over backward.

Homand initially attempted to speak with Lovering, but Lovering only groaned in response and gestured toward his legs. The officer assisted Lovering by straightening out his legs from under his body so that Lovering was lying flat on his back. The officer then noticed "a ligature mark or a red circular mark around the front of his neck." Homand testified that he "didn't see if it went all the way around because he was on his back, but it went at least the three-quarters that were visible around his neck." The officer also observed a dried substance on Lovering's lips and chest, which he believed to be either blood or vomit.

Other emergency personnel arrived at the scene shortly thereafter, including Officer Anthony Marceau and a team of paramedics. Paramedic Mackenzie Kelsey, who first attended to Lovering, found him to be conscious but unable to communicate with her. Kelsey observed that Lovering was very pale—an indication of severe oxygen deprivation. She also observed that

Lovering had dried blood and vomit on his chest and "bruising and marks around his neck." According to Kelsey's testimony, the marks on Lovering's neck "were very red" and "were very thin" and appeared to her "to be something that had recently happened" given their color. Kelsey explained that there were "multiple marks across his neck and they went straight across his neck." However, according to paramedic Ashleigh Ridenour's testimony, "[t]here were multiple marks in different stages, so some were older and some were fresh." Ridenour explained that the marks "were different colors. There were some that were red and there were some that were more purple in color." On the basis of these observations, Ridenour believed that some of the marks were fresh but others were old. The paramedics determined that Lovering's blood oxygen was extremely low, his heartbeat was very fast, and his levels of potassium were high. The paramedics provided oxygen to Lovering, put him on a stretcher, and transported him to William W. Backus Hospital in Norwich in an ambulance.

During trial, Kelsey testified that the defendant was acting in an unusual manner when she and the other paramedics arrived at the apartment. Kelsey explained that the defendant "didn't seem to want to make eye contact with us. He didn't seem to want to really speak with us in detail. When we were taking [Lovering] out of the room, placing him on the stretcher, I did note that he seemed to be blocking another door or walkway into another part of the apartment and wouldn't let anybody through into that area. And then, in the midst of information being communicated to me through [Ridenour], the story in which what had happened to [Lovering] changed multiple times. There was two or three iterations of what had actually happened." On cross-examination, Kelsey conceded that had she known the defendant was autistic, she potentially would have changed her perception of his behavior.[2]

Meanwhile, Homand and Marceau looked around the apartment to determine if there was anything there that could have caused the red marks on Lovering's neck, such as a rope, a belt, or a similar item. Although the officers searched for this purpose throughout the common areas of the apartment and in Lovering's bedroom, they found nothing that, in their opinion, could have caused the marks. The officers, however, never searched, or even entered, the defendant's separate bedroom on that day.

At Backus Hospital, Lovering was placed in the care of Melissa Lin Monte, an emergency department physician. Lin Monte found Lovering's lower legs to be very swollen and his calves to be extremely firm, which she found to be consistent with a lack of blood flow to his lower legs. She also found that Lovering's potassium levels were dangerously high—higher than she had ever

seen before—which she understood to be an indicator of muscle breakdown of the sort that can be caused when a person remains immobile for a prolonged period of time.

Because of the severity of Lovering's condition, he was put in a medically induced coma and then transferred to the intensive care unit. After Lovering was transferred, however, the condition of his legs worsened. On the basis of the seriousness of the condition of his legs, Lovering was ultimately transferred by helicopter to Hartford Hospital.

At Hartford Hospital, Parth Shah, a vascular surgeon, examined Lovering's legs and determined that they needed to be amputated below the knee because of the breakdown of his leg muscles. After Lovering's lower legs were amputated, he remained in a coma until the evening of October 27.

Marceau, who had followed the ambulance to Backus Hospital, filled out an emergency evaluation request form to ensure that Lovering would be seen by a psychologist within forty-eight hours of his admission to the hospital. Marceau testified that he had filled out the form because he believed that the cause of Lovering's injuries was an attempted suicide. Marceau based this belief on the defendant's statements to the police, on Lovering's alleged past attempts at suicide, and on Lovering's dire physical condition at the time he was found.

Later, however, on November 2, six days after Lovering emerged from the coma, he told his mother that the defendant had strangled him. Lovering's mother immediately called the police to report her son's allegations. On the basis of Lovering's allegation that the defendant had strangled him, the police went to the defendant's apartment on November 2 to interview him. After questioning the defendant in his apartment, Detective Kyle Besse asked the defendant to come with him to the police station to answer more questions, and the defendant agreed. At the police station, the defendant was placed in an interview room and the interview was recorded. The defendant also gave Besse access to his cell phone. Besse then asked the defendant to repeat his story from the beginning. Besse testified that the defendant's story changed slightly during this second round of questioning. Specifically, at the police station, the defendant mentioned for the first time that Lovering had told him that he had had sex with Muskus. Besse thought it suspicious that, even though the defendant had said that he "wanted to hit [Lovering]" when he learned of Lovering's sexual activities with Muskus, he admittedly "was trying to think up ahead how this would look [if he did so]. . . . Like, in retrospect now, like, even in the hospital—'cause, like, his mom asked, well, how did he get a black eye; a nurse would have asked me, well, how did he get a black eye; a[nd] police would have asked, how'd he get a black eye. I would have had

to say, well, I hit him." Besse responded by telling the defendant that he was "still getting the sense that there's something. Every time I ask you that—you know, what else happened, what else happened—you give me a sign that you're not comfortable enough to be completely honest." The defendant then told the detective that, "[m]entally, the only thing with me is, I have Asperger's syndrome, which is like a form of autism."

The defendant was subsequently arrested and charged with assault in the first degree in violation of § 53a-59 (a) (1), assault in the first degree in violation of § 53a-59 (a) (3), strangulation in the first degree in violation of General Statutes § 53a-64aa (a) (1) (B), cruelty to persons in violation of § 53-20, and tampering with physical evidence in violation of § 53a-155 (a) (1). After a jury trial, the defendant was found guilty of assault in the first degree in violation of § 53a-59 (a) (3), cruelty to persons in violation of § 53-20, and tampering with physical evidence in violation of § 53a-155 (a) (1). The jury found the defendant not guilty of assault in the first degree under § 53a-59 (a) (1) and strangulation in the first degree under § 53a-64aa (a) (1) (B).[3] Before he was sentenced, the defendant filed a timely motion for a new trial on the ground that the jury's guilty verdict was against the weight of the evidence. The court denied that motion prior to the defendant's sentencing. Thereafter, the court sentenced the defendant to a total effective term of twenty years of incarceration, execution suspended after ten years, and five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court violated his constitutional right to due process and a fair trial by failing to instruct the jury on the manner in which it could use evidence of the allegedly incomplete and biased police investigation in determining whether he was guilty of the charged offenses. The defendant argues that the jury charge as given prejudiced him because it could have "misled [the jury] into thinking it could not conclude that the investigation's inadequacies, which were the heart of the defense, could be a reasonable basis to find a lower probative value in the evidence the investigation produced, resulting in reasonable doubt." We agree.

The following well established legal principles guide our analysis of the defendant's first claim of error. "[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense. . . . Where . . . the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury

is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 598–99, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). "If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n error in instructions in a criminal case is reversible error when it is shown that it is reasonably possible for errors of constitutional dimension or reasonably probable for nonconstitutional errors that the jury [was] misled." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 309–10, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 849–50, 256 A.3d 131 (2021).

## A

We first consider whether the trial court committed instructional error when it failed to inform the jury of the defendant's right to rely on the alleged inadequacy of the police investigation as a possible basis for finding that the state had failed to prove him guilty beyond a reasonable doubt.

"[T]his court has recognized that defendants may use evidence regarding the inadequacy of the investigation into the crime with which they are charged as a legitimate defense strategy. . . . Conducting a thorough, professional investigation is not an element of the government's case. . . . A defendant may, however, rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect." (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 322 Conn. 270, 282, 140 A.3d 939 (2016). "[T]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence. A jury may find a reasonable doubt if [it] conclude[s] that the investigation was careless, incomplete, or so focused

on the defendant that it ignored leads that may have suggested other culprits." (Internal quotation marks omitted.) Id., 283.

The following additional facts are relevant to our resolution of this claim. The main theory advanced by the defendant at trial was that the police had conducted an inadequate investigation of the incident. Specifically, the defense argued that the police had (1) failed to consider and investigate the possibility that Lovering's injuries had been self-inflicted and (2) acted with bias and prejudice against the defendant because he was autistic.

During closing argument, defense counsel argued that "[t]he government's case is fundamentally flawed. The government wants you to find [the defendant] guilty based solely upon the unreliable, uninvestigated, and uncorroborated allegations of [Lovering]. They want you to ignore the fact that it failed to conduct a complete and unbiased investigation. . . . Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion. The government hasn't even attempted to do that. . . . Detective Besse testified in front of you it never occurred to him that these allegations might not be true. It never occurred to him that [Lovering], what he was saying might be false; that he might be mistaken. . . . You can't rely upon the evidence presented in court based upon this incomplete and biased investigation. . . . These are alternative, innocent explanations that needed to be considered, investigated in an attempt to rule [them] out. They needed to gather evidence specifically on these issues.

"There's an obvious alternative innocent explanation in this case. [Lovering] lost consciousness due to acute alcohol intoxication. . . . Possibly [Lovering] engaged in some sort of suicide gesture at the time when he was highly intoxicated around 3:30 in the morning on October 22, 2016. . . . It's also reported that he has a history of loss of consciousness, especially when he's drinking or— specifically, when he's drinking. . . . [Lovering] had a practice of kneeling, putting his buttocks onto his feet, and even he was so flexible, he could go all the way back. . . . Acute alcohol intoxication alone is sufficient to explain the serious medical injuries. . . . Detective Besse never considered that. . . . There are many alternative, innocent explanations for the red marks on [Lovering's] neck. Possible suicide gesture, scratches by [Lovering] or someone else. There's talk about him engaging in self-harm. . . . They could be explained by falls while he's intoxicated, falling on the stove, and there was evidence of other falls. . . . It could have been nonfatal autoerotic activities . . . . It could have been caused by the self-flagellation with the flogger or cat-o'-nine-tails whip. . . . Isn't that extraordinary that someone can be arrested and put on trial and that there never is an investigation or serious investigation or even a

moment of consideration that the allegations might not be true? It's shocking. That alone is cause for reasonable doubt."

In support of the defense theory of an inadequate police investigation, the defense elicited testimony from numerous witnesses at trial directing the jury's attention to inadequacies and omissions in the investigation. First and foremost, on cross-examination, Besse, the lead detective, testified that he never considered the possibility that Lovering's allegation that the defendant had strangled him was not true. Besse testified that he briefly considered the possibility that Lovering's injuries were caused by autoerotic asphyxiation[4] but quickly ruled it out as a possibility due to the absence of any type of ligature near Lovering when he was found and the fact that his pants were on at that time. Besse simply testified that he had no reason to disbelieve Lovering's allegation that the defendant had strangled him.

Additionally, Lovering's Facebook records were not obtained and reviewed by the police to determine if they were consistent with Lovering's version of events prior to the arrest of the defendant. In fact, according to the testimony of Facebook employee Christine Oliveira, Lovering's Facebook records were not requested by the state until May 23, 2018, more than eighteen months after Lovering suffered his injuries, and no preservation request for those records was ever made, making it possible for messages to have been deleted from the records before they were finally produced. Once the records were obtained in 2018, they revealed a previously undiscovered message suggesting that Lovering was planning to die by suicide, which was sent to Muskus from Lovering's account at 3:30 a.m. on October 22. The message cryptically, but ominously, told Muskus to "[h]ave fun with my death."

Besse also testified that he never made a time line of events on October 22, 2016, although, admittedly, that would have been helpful to the investigation, for it would have revealed inconsistencies in Lovering's version of events. Besse also conceded on cross-examination that he had failed to reconcile the claim made by Lovering's mother—that Lovering had awakened from the coma on November 2, 2016, and immediately told her that the defendant had strangled him—with Lovering's phone records showing that he had first awakened from the coma and begun to make calls from his cell phone more than one week earlier, on the evening of October 27. Besse testified that, if he had realized this inconsistency, he would have interviewed both Lovering and his mother about their claims. He also stated that, if this inconsistency had been discovered earlier, as it should have been, before the defendant was arrested, it would have been brought to the court's attention in the application by the police for a warrant for the defendant's arrest.

Furthermore, Besse testified that he did not interview either Lovering or Lovering's mother on November 2, the day the mother reported her son's belated allegation that the defendant had strangled him. Instead, Besse interviewed only the defendant on that day. In fact, Besse conceded in his testimony that he never interviewed Lovering or his mother about the allegation that the defendant had strangled him.

Last, defense counsel elicited testimony from Besse that he never considered the possibility that the defendant's autism could explain his peculiar behaviors or his inconsistent statements to paramedics and the police when they responded to his 911 call about Lovering's injuries.

Defense counsel also adduced testimony about the small number and poor quality of the photographs that were taken by the police to document Lovering's injuries. Specifically, James R. Gill, the state's chief medical examiner and a forensic pathologist, testified that, although multiple, close-range photographs are typically taken of neck compression injuries in order to document them and assist in determining their cause, the police in this case took just one blurry photograph of Lovering's injured neck. Ljubisa J. Dragovic, a forensic pathologist, also testified that the one blurry photograph taken in this case of the marks on Lovering's neck was insufficient to support any conclusion as to what had caused those marks. According to Dragovic, at least four photographs are required to determine the cause of a neck injury: "The strangulation of any type of neck manipulation calls for [a] photograph from the front of the neck, [a] photograph of the left side, [a] photograph of the right side, and [a] photograph of the back of the neck . . . ." Dragovic further testified that, in this case, with one photograph alone, "you cannot say anything but that—other than there is an obliquely oriented pattern of three lines in the front of the neck. That's all you can conclude on the basis of this photograph."

In connection with his defense of an inadequate police investigation, the defendant filed a written request to charge the jury, which provided in relevant part: "You have heard evidence and argument that the police investigation was inadequate and that the police involved in this case were incompetent. The ultimate issue for you to decide is not the thoroughness of the investigation or the competence of the police. Rather, the ultimate issue you have to determine is whether the state, in the light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged.

"You should not acquit the defendant merely because you conclude that the police have conducted an inadequate investigation. *However, you may consider the*

*completeness or incompleteness of the police investiga-*
*tion when deciding whether the state has presented*
*evidence sufficient to preclude every reasonable*
*hypothesis inconsistent with the defendant's guilt. You*
*may also consider whether the evidence concerning*
*the adequacy of the police investigation affects the*
*credibility of any witnesses who testified or the relia-*
*bility of any evidence before you.*" (Emphasis added.)

On December 4, 2018, the court held a charge confer-
ence. The first paragraph of the defendant's requested
jury charge was substantially similar to the former
model criminal jury instruction on investigative inade-
quacy then published on the Judicial Branch website.[5]
In discussing this paragraph of the defendant's requested
jury charge, the court noted that "it's factually disputed
that the police investigation was inadequate and the
police involved were incompetent . . . this is a charge
that should probably be there." The court then stated,
however, that, although it was willing to instruct the
jury in accordance with the first paragraph of the defen-
dant's request to charge, it was not inclined to instruct
it in accordance with the second paragraph of the
request to charge, as previously quoted in italics. In
response, defense counsel argued that "informing the
jury that this isn't the ultimate issue is potentially mis-
leading without informing them how to use the evidence
of the police investigation . . . ." The state, however,
argued that "the first paragraph . . . fairly puts the
issue before the jury . . . ." After considering the argu-
ments from both parties, the court ruled that it would
not instruct the jury in accordance with the second,
italicized paragraph of the defendant's request to
charge, explaining: "Well, I think it's certainly fair com-
mentary for closing argument with regard to whether
the adequacy of the investigation affect[s] the credibility
of any witnesses, and so I do think that's something
that can be addressed that way. It's not part of the
pattern instruction. . . . I'm going to deny your request
for that second paragraph. I think the jury does have
sufficient ability to consider that evidence appropriately
under all of the court's instructions when taken as a
whole."

Consistent with its foregoing ruling at the charge
conference, the court later instructed the jury in rele-
vant part: "You may have heard some argument that
the police investigation was inadequate and that one
or more police officers involved in this case were incom-
petent. The issue for you to decide is not the thorough-
ness of the investigation or the competence of the
police. The only issue you have to determine is whether
the state, in the light of all the evidence before you, has
proved beyond a reasonable doubt that the defendant
is guilty of the counts with which he is charged."

We agree with the defendant that the jury charge
given by the court was erroneous because it failed to

inform the jury of his right to have it consider the inadequacy of the police investigation in evaluating whether the state had proven him guilty beyond a reasonable doubt.

Our Supreme Court's recent decision in *State* v. *Gomes*, supra, 337 Conn. 826, governs the analysis of this claim on appeal. In *Gomes*, "[t]he main defense advanced by the defendant was that the police had conducted an inadequate investigation of the incident." Id., 832. Defense counsel in *Gomes* argued that the state had not proven its case beyond a reasonable doubt on the basis of inadequacies in the police investigation. Id. At trial, defense counsel elicited testimony that (1) the defendant had left the scene of the crime before the victim was assaulted, (2) another individual was beaten up by a group of club patrons immediately after the victim had sustained her injuries, (3) officers who were dispatched to the scene were informed that another individual was a suspect in the assault but never investigated that other individual as a suspect, (4) the officers did not ask for the names of or contact information for any witnesses at the scene or attempt to interview them as to what they had seen, and, (5) although the victim had selected the defendant's photograph from an array at the police station and stated she was 100 percent confident that he was the person who had attacked her, she testified that she had never met or seen the defendant prior to the night in question and that she had only a split second to observe her attacker. Id., 831–32, 847–48.

"During closing arguments, defense counsel [in *Gomes*] argued that this case screams reasonable doubt. . . . [T]he police completely failed in this case, and they completely failed [the victim]. They didn't go back to that scene that night. They didn't identify the crime scene. They didn't take any photos so that you, ladies and gentlemen, could see how the scene looked that night. How the lighting looked. They never tried to get any surveillance video. . . . They didn't confirm what happened. Defense counsel also argued that the police spent ninety minutes on this investigation, and that the case boil[ed] down to one witness and what she saw in a split second, and she may very well believe that [the defendant] did this to her." (Internal quotation marks omitted.) Id., 832.

"In connection with his defense of inadequate police investigation, the defendant had filed a written request to charge the jury, which provided in relevant part: [1] You have heard some arguments that the police investigation was inadequate and biased. [2] The issue for you to decide is not the thoroughness of the investigation or the competence of the police. [3] However, you may consider evidence of the police investigation as it might relate to any weaknesses in the state's case. [4] Again, the only issue you have to determine is

whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged." (Internal quotation marks omitted.) Id., 833.

During the charge conference in *Gomes*, "the court told defense counsel that it would be charging on the adequacy of the police investigation, in a form that was somewhat similar to the defendant's requested instruction, but that [its instruction] may be a little bit different." (Internal quotation marks omitted.) Id. At trial, however, the court instructed the jury, in relevant part, using the then model jury instruction: "You have heard some arguments that the police investigation was inadequate and that the police involved in the case were incompetent or biased. The issue for you to decide is not the thoroughness of the investigation or the competence of the police. The only issue you have to determine is whether the state, in light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he was charged." (Internal quotation marks omitted.) Id. Defense counsel excepted to the jury instructions as given. Id., 833–34.

The jury subsequently found the defendant guilty, and the defendant appealed to this court. Id., 834. The defendant claimed that "the jury instructions, as given, deprived him of his right to present a defense of investigative inadequacy. Specifically, the defendant argue[d] that the [trial] court erred in failing to include point three of his requested jury charge, which [provides]: However, you may consider evidence of the police investigation as it might relate to any weaknesses in the state's case. The defendant argue[d] that without the inclusion of this requested sentence, the jury would not have understood how to use the evidence [defense counsel] was able to elicit about the inadequacies of [the police investigation]." (Internal quotation marks omitted.) Id. This court rejected the defendant's claim, "noting that the instruction given by the trial court was (1) identical to the model criminal jury instruction on investigative inadequacy provided on the Judicial Branch website, and (2) consistent with investigative inadequacy instructions approved by [our Supreme Court in other cases]." (Citations omitted; footnote omitted.) Id., 834–35. A certified appeal to our Supreme Court followed. Id., 837.

In *Gomes*, our Supreme Court reversed, holding that "the model jury instruction utilized by the trial court . . . failed to inform the jury not only of a defendant's right to rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt . . . but also the jury's concomitant right to consider any such deficiencies in evaluating whether the state ha[d] proved its case beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.)

Id., 853.

In explaining its decision, our Supreme Court stated that, "[a]lthough the model instruction is similar to the instructions this court approved in *Williams* and *Collins* because it informs the jury not to consider investigative inadequacy in the abstract . . . the model instruction, unlike the instructions in *Williams* and *Collins*, improperly fails to inform the jury that a defendant may present evidence of investigative inadequacy in his or her *particular* case. Indeed, as the defendant argues, the model instruction omits the very language that the court in *Collins* determined rendered the instruction in that case acceptable because it (1) apprised the jury that the defendant was entitled to make an investigation and put his evidence before [it], and (2) directed the jury to determine, *based on all the evidence* before [it], including evidence presented by the defendant, whether the state had proved the defendant's guilt beyond a reasonable doubt. . . . The language that the defendant requested be added to the model jury instruction—i.e., that the jury may consider evidence of the police investigation as it might relate to any weaknesses in the state's case—would have similarly apprised the jury of the defendant's right to present an investigative inadequacy defense and the jury's right to consider it in evaluating the strength of the state's case." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 853–54 (citing *State* v. *Collins*, supra, 299 Conn. 567; *State* v. *Williams*, 169 Conn. 322, 363 A.2d 72 (1975)).

The court in *Gomes* also stated that the model criminal jury instruction on investigative inadequacy "should be improved on to better convey, as this court recently explained in [*State* v. *Wright*, supra, 322 Conn. 283], that '[t]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence. A jury may find a reasonable doubt if [it] conclude[s] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits.' " Id., 856 n.20.

"Toward that end, [the court in *Gomes*] encourage[d] our trial courts going forward to utilize the following investigative inadequacy instruction, which bears resemblance to the one utilized by the Massachusetts courts: You have heard some testimony of witnesses and arguments by counsel that the state did not (mention alleged investigative failure: e.g., conduct certain scientific tests, follow standard procedure, perform a thorough and impartial police investigation, etc.) in this

case. This is a factor that you may consider in deciding whether the state has met its burden of proof in this case because the defendant may rely on relevant deficiencies or lapses in the police investigation to raise reasonable doubt. Specifically, you may consider whether (relevant police investigative action) would normally be taken under the circumstances, whether, if (that/those) action(s) (was/were) taken, (it/they) could reasonably have been expected to lead to significant evidence of the defendant's guilt or innocence, and whether there are reasonable explanations for the omission of (that/those) action(s). If you find that any omissions in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the state to prove beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged. The ultimate issue for you to decide, however, is whether the state, in light of all of the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged."[6] Id.

Here, as in *Gomes*, the main defense theory advanced by the defendant was that the police had conducted an inadequate investigation of the incident. The state attempts to distinguish the facts here from *Gomes*, arguing that *Gomes* is not controlling because the defendant here attacked the *conclusions* the police drew from their investigation rather than the actual police *investigation* itself. We disagree. As previously detailed, defense counsel elicited testimony from numerous witnesses regarding deficiencies or lapses in the police investigation. Specifically, he presented evidence that the police failed (1) to consider the possibility that Lovering's allegation that the defendant strangled him was not true or that Lovering's injuries were caused by autoerotic asphyxiation, (2) to obtain and preserve Lovering's Facebook records, (3) to make a time line of events on October 21 and 22, (4) to interview Lovering or his mother about Lovering's alleged statement to her that the defendant had strangled him, (5) to reconcile the inconsistency between the statement of Lovering's mother that Lovering had first awakened from his coma and begun to talk to her on November 2 with his phone records, which indicated he had first awakened from the coma and begun to use his cell phone on October 27, (6) to consider that the defendant's autism was a possible explanation for his unusual behavior after he reported Lovering's injuries to the police, and (7) to sufficiently document, either descriptively or photographically, the injuries to Lovering's neck. Contrary to the state's argument, this evidence certainly highlights shortcomings in the police *investigation* itself, not simply in the *conclusions* the police drew from their investigation. Moreover, the court

noted during the charge conference that "it's factually disputed that the police investigation was inadequate and the police involved were incompetent." As a result, the defendant was entitled to have the jury consider evidence of any relevant deficiencies or lapses it might find in the police investigation as bases for entertaining reasonable doubt as to the defendant's guilt. See *State* v. *Wright*, supra, 322 Conn. 282 ("[a] defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect" (internal quotation marks omitted)).

Additionally, here, as in *Gomes*, by instructing the jury that "[t]he issue for [it] to decide [was] not the thoroughness of the investigation or the competence of the police" and that "[t]he only issue [it had] to determine is whether the state, in the light of all the evidence . . . has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged," the court failed to inform the jury of the defendant's right to rely on relevant deficiencies or lapses in the police investigation as possible bases for raising reasonable doubt as to his guilt.[7] The jury instruction failed to inform the jury of its "concomitant right to consider any such deficiencies in evaluating whether the state has proved its case beyond a reasonable doubt." *State* v. *Gomes*, supra, 337 Conn. 853. Had language of the sort requested by the defendant in the second paragraph of his request to charge been added, it would, as the current model jury instruction does, have "apprised the jury of the defendant's right to present an investigative inadequacy defense and the jury's right to consider it in evaluating the strength of the state's case." Id., 854.

Because the court failed to inform the jury of the defendant's right to rely on the inadequacy of the police investigation and the jury's right to rely on such inadequacies in evaluating whether the state has proved its case beyond a reasonable doubt, we conclude that the trial court committed instructional error in charging the jury as it did.

B

Having determined that the trial court improperly instructed the jury as to how it might consider evidence of the inadequacy of the police investigation in conducting its deliberations, we next consider whether the jury charge resulted in prejudice to the defendant. In so doing, we first note that "the state bears the burden of proving that the constitutional impropriety was harmless beyond a reasonable doubt." *State* v. *Brown*, 279 Conn. 493, 511, 903 A.2d 169 (2006).

The defendant claims that the court's instructional error was harmful because "there is at the very least a

reasonable possibility that the jury was misled by the [trial] court's instructions" given the overall weakness of the state's case. We agree.

"When a defendant challenges the trial court's failure to provide a requested charge, or some other impropriety in the jury instructions, one of two separate and distinct legal standards of review is used. If the claimed omission or impropriety is of constitutional dimension, we must be convinced that there is no reasonable possibility that it affected the verdict. . . . When the error is merely of an evidentiary nature, then the defendant must prove that it was reasonably probable that the jury was misled." (Citation omitted.) *State* v. *Ali*, 233 Conn. 403, 422–23, 660 A.2d 337 (1995); see also *State* v. *Gomes*, supra, 337 Conn. 849 ("[a]n error in instructions in a criminal case is reversible error when it is shown that it is reasonably possible for errors of constitutional dimension or reasonably probable for nonconstitutional errors that the jury [was] misled" (internal quotation marks omitted)).

The challenged jury instructions here involve a constitutional right. See *State* v. *Collins*, supra, 299 Conn. 598 ("[a] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense" (internal quotation marks omitted)). "A defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect." (Internal quotation marks omitted.) *State* v. *Wright*, supra, 322 Conn. 282. Because the defendant's claim is of constitutional magnitude, we review his claim by the " 'reasonable possibility' " standard. See *State* v. *Collins*, supra, 598–99 (applying "reasonable possibility" standard where defendant claimed trial court violated his constitutional right to present defense by improperly instructingjury that adequacy of police investigation was not issue in case).

"[T]he United States Supreme Court has repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 279 Conn. 504. "[I]t is well established that a defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . [T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.) *Bell* v. *Commissioner of Correction*, 184 Conn. App. 150, 162, 194 A.3d 809 (2018),

aff'd, 339 Conn. 79, 259 A.3d 1073 (2021).

In *Gomes*, the court held that it was apparent that the instructional error complained of was harmful to the defendant, "[g]iven the relative weakness of the state's case . . . ." *State* v. *Gomes*, supra, 337 Conn. 855. The court determined that the state's case was relatively weak because it "turned almost entirely on the believability of the victim's testimony that, although she had never seen the defendant before the night in question and could not describe him to [a police officer] when they spoke at the hospital following the assault, and although the attack occurred in 'a split second' from behind a six foot fence, she was able to identify the defendant as her assailant from a photographic array conducted more than two weeks later. Defense counsel sought to exploit and amplify the weaknesses in the state's evidence by directing the jury's attention to inadequacies and omissions in the investigation, in particular [the officers'] failure to consider [another individual] as a potential suspect, even though he was identified as such by the police dispatcher, as well as their failure to interview any of the witnesses who approached them on the night in question outside the club, claiming to have information about the assault. Defense counsel asked the jury to find the defendant not guilty on the basis of these investigative lapses because they raised a reasonable doubt as to the trustworthiness of the victim's identification of him as the person who attacked her. We cannot conclude that a properly instructed jury would not have done so." Id., 855–56.

Our Supreme Court in *Gomes* reasoned that there was "a significant risk that the instruction given by the trial court misled the jury to believe that it could *not* consider the defendant's arguments concerning the adequacy of the police investigation. Although the first sentence of the instruction acknowledged that the defendant made arguments that the police had failed to investigate adequately the crime in question, in the very next sentence, the jury was instructed that the adequacy of the police investigation was *not* for it to decide. This admonishment was reinforced by the third and final sentence that the *only* issue for the jury to decide was whether the state had proven the defendant's guilt beyond a reasonable doubt. . . . Thus, rather than apprising the jury that reasonable doubt could be found to exist if the jury conclude[d] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits . . . there is a reasonable possibility that the instruction had the opposite effect and caused the jury to believe that it was *prohibited* from considering any such evidence." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 854–55.

Considered in light of the decision in *Gomes*, the

following additional facts are relevant to our resolution of the state's claim of harmlessness with respect to the improper instruction challenged in this appeal. During the trial, it became apparent that there were weaknesses in the state's case against the defendant. Importantly, no one—not even Lovering—claimed to have seen the defendant strangle Lovering. According to Lovering's testimony at trial, when he was allegedly being strangled, he was sitting with his back to the door, on his knees with his lower legs tucked beneath him, and his buttocks resting on his legs. Lovering testified that this was a common position for him to sit in. At the time, Lovering claimed, he was talking to Muskus, who was sitting on an air mattress in front of him. Lovering testified that, while he and Muskus were talking, he felt pressure around his neck from either rope or a string and then everything went black. However, Lovering testified that he did not see the person who allegedly strangled him. According to Lovering, the next thing he remembered was waking up in the hospital. Muskus, however, did not corroborate Lovering's version of events at trial. According to Muskus' testimony, in the early hours of October 22, after the neighbors had left the apartment, she and the defendant were in the defendant's room when Lovering came into the room. According to Muskus, the defendant told Lovering that he could no longer stay in the apartment. Muskus testified that Lovering began crying. Muskus testified that she remained in the defendant's room for the remainder of the night.

Although Lovering suggested that the only possible explanation for his injuries was that the defendant had attempted to strangle him, testimony from other witnesses supported several alternative explanations for the red marks on his neck. Lin Monte testified that there were three possible explanations for those marks, including (1) an attempted suicide, (2) strangulation, or (3) autoerotic asphyxiation. Dragovic testified that, because of the single, blurry photograph of Lovering's neck injury, "[t]here [were] endless possibilities for [the pattern on Lovering's neck], based on how it appear[ed]" and the "extent of documentation present[ed] to us." Paramedic Kelsey testified that it was possible Lovering's condition had been caused by autoerotic asphyxiation. Paramedic Ridenour testified that the marks on Lovering's neck were of various colors, indicating that some of the marks were fresh but others were old.

Multiple witnesses also testified about possible causes of the injuries to Lovering's legs. Shah testified that the lack of blood flow to Lovering's legs could have been the result of alcohol intoxication. Shah explained that alcohol intoxication can cause a person to lose consciousness and remain immobile for a prolonged period of time, cutting off blood flow to parts of his body. Shah testified that Lovering could have sustained the observed injuries to his legs if he had fallen over

backward while kneeling with his lower legs on the floor and his buttocks resting on his heels. Dragovic also testified that the observed injuries to Lovering's legs could have been caused by acute alcohol intoxication alone, stating: "You can't rule it out because, if there is alcohol intoxication, that is the most logical explanation of these complications . . . because of the position one takes being intoxicated, being under the influence of alcohol, and being in [a] prolonged position in such a way so that it undercuts the circulation, the blood supply to the large bulk of skeletal muscle and skeletal muscle, after [a] few hours, has the tendency to start necrosis and it undergoes necrosis and it shuts down [the] kidneys and there is maybe irreparable damage."

Inconsistencies in Lovering's recollection of events were also revealed at trial. Lovering testified that he has had issues with his memory since suffering a head injury in 2014. Inconsistencies existed between Lovering's written statement to the police on November 11, 2016, and his testimony at trial. Lovering gave a signed, written statement to the police, which did not mention the neighbors coming to the apartment. At trial, however, Lovering testified that he had invited his neighbors into the apartment for a drink.

When Lovering initially woke up from the coma in the hospital, he told his doctors that he had no recollection of what had happened to him on October 22. It was not until several days later, on November 2, that he first told his mother that the defendant had strangled him. When questioned about this inconsistency at trial, Lovering testified that he did in fact remember what had happened to him when he first spoke to his doctors but he had lied to the doctors about it. Lovering testified that he lied to his doctors about the cause of his injuries because he did not want to deal with the situation.

Furthermore, a message suggesting that Lovering was planning to die by suicide was sent from Lovering's Facebook account to Muskus' Facebook account at 3:30 a.m. on October 22, 2016. The message stated: "Have fun with my death." Lovering claimed that he never sent that message. On cross-examination, Lovering testified that he did not have any recollection of what happened during the time period when the message was sent. Lovering testified that he did not believe he sent the message because he "would never put anybody through that turmoil" of thinking that he was going to kill himself. During trial, however, substantial challenges were made to Lovering's memory and general credibility. Lovering admitted, for example, to having had problems with drugs and alcohol in the past but firmly denied that he was intoxicated in the early morning hours of October 22. This claim was flatly contradicted by Gottshall, who testified that she had seen Lovering at about 2:30 a.m. on that date when she and her boyfriend

at the time, who then lived next door to Lovering, returned to the boyfriend's apartment. According to Gottshall, Lovering appeared to be intoxicated at that time, for his speech was slurred, he was stumbling when he walked, and at one point he fell over in the kitchen, striking the stove.

The defense also argued that any alleged inconsistencies in the defendant's recollection of events and his behavior could be explained by his autism. Psychiatrist Alexander Westphal testified that the defendant was autistic, a diagnosis having been made in 2013. According to Westphal, people with autism may have difficulty telling stories in a coherent manner, may have memory deficits, and may attempt to fill in gaps in their memories with events that may not have actually occurred.

Here, as in *Gomes*, there is a "significant risk that the instruction given by the trial court misled the jury to believe that it could *not* consider the defendant's arguments concerning the adequacy of the police investigation." (Emphasis in original.) *State* v. *Gomes*, supra, Conn. 854. As the court explained in *Gomes*, "[a]lthough the first sentence of the instruction acknowledged that the defendant made arguments that the police had failed to investigate adequately the crime in question, in the very next sentence, the jury was instructed that the adequacy of the police investigation was *not* for it to decide. This admonishment was reinforced by the third and final sentence that the *only* issue for the jury to decide was whether the state had proven the defendant's guilt beyond a reasonable doubt. . . . Thus, rather than apprising the jury that reasonable doubt could be found to exist if the jury conclude[d] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits . . . there is a reasonable possibility that the instruction had the opposite effect and caused the jury to believe that it was *prohibited* from considering any such evidence." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 854–55. Because there is a reasonable possibility that the instruction caused the jury to believe that it was prohibited from considering evidence of the inadequacy of the police investigation, the jury may have ignored key evidence introduced by the defendant at trial, as previously described, concerning the inadequacy of the investigation.

Furthermore, "[g]iven the relative weakness of the state's case, it also is apparent that the instructional error was harmful to the defendant." Id., 855. As previously noted, the state's case against the defendant turned almost entirely on the believability of Lovering's allegation that the defendant had strangled him, although Lovering did not actually see the defendant attempt to strangle him. Defense counsel also adduced evidence tending to undermine Lovering's credibility,

particularly as to inconsistencies in his claimed recollection of events on the evening of October 22, lies he admittedly told his doctors after he awakened from his coma, and the message sent from his Facebook account to Muskus' Facebook account that stated: "Have fun with my death," which suggested that he was then contemplating his own imminent death, and thus possibly planning to die by suicide.

At trial, defense counsel sought to exploit and amplify the weaknesses in the state's case by directing the jury's attention to testimony from various witnesses concerning these weaknesses. In particular, defense counsel elicited testimony that there were alternative explanations for Lovering's neck injuries, including attempted suicide or autoerotic asphyxiation and that the marks on Lovering's neck were of various colors, indicating that some of them may have been made on a previous occasion. Testimony also revealed that Lovering's leg injuries could have been caused by prolonged immobility of his legs during a period of unconsciousness resulting from acute alcohol intoxication. Defense counsel also argued that any inconsistencies in the defendant's statements and his odd mannerisms could be explained by his autism.

During closing argument, defense counsel asked the jury to find the defendant not guilty on the basis of reasonable doubt arising both from the many alleged inadequacies of the police investigation that led to his arrest and prosecution, and from the overall weakness of the state's case. Here, as in *Gomes*, we conclude that the defendant's conviction must be reversed because the state has not proved beyond a reasonable doubt that a properly instructed jury would not have entertained a reasonable doubt as to the defendant's guilt on the basis of the alleged deficiencies in the police investigation and thus found the defendant not guilty of all charges in this case.

As a result, we conclude that there was a reasonable possibility that the trial court's instructional error misled the jury, that it affected the verdict, and, thus, that it was not harmless beyond a reasonable doubt, resulting in prejudice to the defendant. See *Bell* v. *Commissioner of Correction*, supra, 184 Conn. App. 162 ("[I]t is well established that a defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . [T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (Internal quotation marks omitted.)). Accordingly, the proper remedy is to reverse the judgment of conviction and remand this case for a new trial.

II

The defendant also claims that the trial court improperly admitted into evidence a police disciplinary report in violation of his state and federal constitutional rights to confront the witnesses against him.[8] Specifically, the defendant argues that the report (1) constituted hearsay that was not admissible under the business record exception to the hearsay rule and (2) was testimonial. We agree.

"The standard under which we review evidentiary claims depends on the specific nature of the claim presented. . . . To the extent a trial court's admission of evidence is based on an interpretation of [law], our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . As a general matter, hearsay statements may not be admitted into evidence unless they fall within a recognized exception to the hearsay rule. . . . In the context of a criminal trial, however, the admission of a hearsay statement against a defendant is further limited by the confrontation clause of the sixth amendment. Under *Crawford* v. *Washington*, [541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], hearsay statements of an unavailable witness that are testimonial in nature may be admitted in accordance with the confrontation clause only if the defendant previously has had the opportunity to cross-examine the unavailable witness. Nontestimonial statements, however, are not subject to the confrontation clause and may be admitted under state rules of evidence. . . . Thus, the threshold inquiries that determine the nature of the claim are whether the statement was hearsay, and if so, whether the statement was testimonial in nature, questions of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 617–19, 960 A.2d 993 (2008).

The following additional facts and procedural history are relevant to our resolution of this claim on appeal. During trial, the prosecution sought to introduce into evidence a police observation report (report) written by Sergeant Thomas Lazzaro on January 7, 2017, concerning Marceau's performance during the investigation of this case, in order to show the actions taken by the police department in response to that performance. The first page of the report indicated that Marceau's work on this case was "unsatisfactory" as to his (1) techniques of assignment, (2) judgment and decision-making, (3) quality of work, and (4) initiative. The second page, with the subsequently redacted material italicized, read: "On 10/22/2016 at approximately 1733 hours Officer Marceau and Officer Homand responded to a residence for a medical call . . . . The caller stated *that the victim* had red marks around his neck and stated he believed *the victim* tried to hang himself. While at the

scene *the victim* was not conscious and could not provide any information. Officer Marceau stated there were ligature marks present on the *victim's* neck. As a result Officer Marceau investigated the incident as a suicide attempt [and] *the victim* was transported to Backus Hospital. *It was later determined, when the victim regained consciousness, that the incident was not a suicide attempt. The victim* later provided information that suggested the reporting person caused *the victim's* injuries. The case was later turned over to the Detective Division as a serious assault investigation.

"In light of the facts provided following Officer Marceau's investigation, it was determined that the information which suggested the incident was an assault could have been discovered during the initial report. Some inconsistencies in the information provided by the reporting person and the scene itself clearly required further investigation by the officers who initially responded to the scene. As a result, valuable evidence and on scene interview opportunities may have been lost which adversely affected the investigation.

"*More specifically, Officer Marceau failed to look for, ask and identify any object in the area that could have been used to make the victim's ligature marks which he clearly observed. Officer Marceau failed to recognize the statements from the witnesses and information did not correspond to what he was observing in the area and around the victim.* No photographs were taken of the scene. Furthermore, the on duty road supervisor was not contacted as a resource.

"As a result of this incident it is apparent that Officer Marceau can improve his performance in similar circumstances by probing further in on scene interviews with principal parties involved. Officer Marceau can improve by not taking information provided to him at face value. *Officer Marceau should spend more time asking more questions when his observations do not match information he gathers from evidence at the scene, witnesses and the statements of medical personnel on scene or anyone else involved.* Officer Marceau should be clearly aware that if he has a question at any time for any incident, he can contact the road supervisor and should that supervisor not be available, he may contact the shift supervisor."

The defense objected to the admission of the report, arguing that it included the state's opinion about the strength of its case. Defense counsel argued that "there are things in [the report] that are clearly just bolstering of the prosecution's case. Where whoever it is that wrote this report, Sergeant Lazzaro is claiming that, in light of the facts provided following Officer Marceau's investigation, it was determined that the information, which suggests the incident was an assault and could have been discovered during the initial report. That's just plainly bolstering. It's an opinion that—it shouldn't

be admitted into evidence." Defense counsel also stated that he planned to question Marceau about the report but that he "certainly wouldn't be offering it for the truth of this was clearly an assault. That's highly inappropriate." Defense counsel also added that, "[t]his is not a disciplinary report, Your Honor. It's made to appear as if he's being disciplined to bolster their case, but they shouldn't be allowed to, in the process, express their opinions to the jury about the strength of their case."

In response to defense counsel's objection, the prosecutor argued that the state was "claiming all of it now because this was the action that they took. And it doesn't say clearly assaulted. It says suggested, I think, but this is the action that the police department took against him, and that's not exactly phrased properly. But this is the police response to this. That the objection that this bolsters the state's case—well, all of our evidence is intended to bolster the state's case. I mean, there's nothing particularly wrong with the state trying to move its case forward. There's no question that's what I'm doing." The prosecutor argued that the report should "go into evidence with the possibility of redactions in the future."

The court stated, "I haven't heard any testimony about [the report] yet, so I don't know if you're asking me to rule on it at this point, but, based on what I understand or anticipate the state would be establishing, I would think that some of this would be admissible, and I would entertain a request that some parts of it be redacted." The court then overruled defense counsel's objection, and the report was admitted into evidence as a full exhibit subject to redaction.

The following day, the defendant filed a motion for reconsideration regarding the admission of the police report. In his motion, the defendant argued that the report was inadmissible hearsay and that the state had not laid an adequate foundation to meet the requirements of the business record exception to the rule against hearsay. The defendant further argued that the admission of the report violated his right to confront the witnesses against him pursuant to the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.

The court heard argument on the motion, and defense counsel iterated his assertion that the report constituted inadmissible hearsay and that the state had not laid an adequate foundation to meet the requirements of the business record exception because "there's no evidence that it was the regular course of business to make these observation reports or that this one, in particular, was made in a regular course of business. In fact, it seems as though this was a special, rare occurrence that's outside the usual course of business for the police

department. Next, in order for something to be a business record, it needs to be created within a reasonable amount of time after the incident that's being described. Here, this was made close to three months after the investigation was initiated, and the events described took place almost three months before the report was prepared. Finally, it was prepared by Sergeant [Lazzaro], who has no role in the investigation of this case. It's not based, in any way, on his personal knowledge, and so, given that, there's no reason to think that it has the requisite reliability to qualify as a business record. The second related issue is that it violates the defendant's right to confrontation. The person who produced this record has not been a witness. . . . The defendant has a right to be able to present evidence before the jury through cross-examination of any witness who testifies against him."

The prosecutor, in response, argued that, "we did move pursuant to the business record exception, [§ 8-4 of the Connecticut Code of Evidence], and I think we did lay a proper foundation under those rules, and I don't think it's fair, at this juncture, after it's already been admitted, to claim a lack of proper foundation. . . . In regard to [the argument] that the record is required to be done or created close in time to the event to which [it] purports to be about, we're not saying that that record is, in and of itself, about the events of October 22, 2016. We're saying it's about the police officer's conduct, and there was what is referred to in the police department as an observation—an observation report was made, and this document is contemporaneous with that event. I'm using the word disciplined, but it's not exactly the accurate word, as I understand the rules of the police department, but it is an accurate account of what the police department did in regard to this police officer that the higher-ups felt had done a job that could have been done better. And that's what that report is about, directly. It's not directly about the incident of October the 22nd, 2016, nor do we claim it. [Defense counsel] says that the individual who prepared the report wasn't here or available for cross-examination. Of course, this is the exact reason for the business record exception. That's [sub]section B [of § 8-4 of the Connecticut Code of Evidence] entitled witness need not be available. . . . And the point of the document was that the police officer was held accountable in some sort of way by the authorities for what they considered to be an inadequate performance on or about October 22, 2016. That's what the report is meant to address. That the police department looked at this conduct of the police officer and found it to be an inadequate response." The prosecutor also argued, in the alternative: "I would assert that it's introduced [as nonhearsay], and it is not for the truth of what's purported in the document. The purpose of the entry was to show this is the action the police department took in regard

to this investigation by this particular police officer.''

In rebuttal, defense counsel argued that "we need to be able to cross-examine the person who made [the report] in order to adequately present the case. Second, almost the entire second page describes the investigation of this case. Now, if this document is admitted for the purpose of simply showing that someone was unhappy with his work, I think virtually the entirety of the second page needs to be redacted because none of that would come in under, through the business record exception. . . . And I would point out, even though the business record exception does allow for documents that were not produced—or it doesn't require the maker of the document to come in—the confrontation clause does, and, in this instance, a criminal proceeding, that trumps the rule of evidence."

The court subsequently granted the defendant's motion for reconsideration, but after reconsideration, it ruled that its "prior decision to allow [the report] to be a full exhibit with redactions stands." From the bench, the court stated: "[U]nder the circumstances, since the document is being offered by the state only to show that this was action that the Norwich Police Department took, I am going to permit it to continue to be marked as a full exhibit. However, I do understand the defendant's concern, and I am going to permit substantial redactions, particularly with respect to the narrative on page two, which, I think, could fairly be viewed as bolstering the state's case improperly. So, I am going to permit anything that could be viewed that way to be redacted from this document. But because the state is offering it really only to show that this was the action that the Norwich Police Department took and not for the truth of those matters that are contained, particularly on page two, I am going to permit it to continue to be marked as a full exhibit." Redactions, as detailed previously, were subsequently made to the report, and the report was published to the jury as a full exhibit.

We agree with the defendant that the report constitutes inadmissible hearsay and that the state failed to lay an adequate foundation to satisfy the business record exception to the hearsay rule. We further agree that the report was testimonial, and therefore, its admission into evidence in this case violated the defendant's state and federal constitutional rights to confront the witnesses against him.

We first consider, as a threshold inquiry, whether the report constituted hearsay. "An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . The hearsay rule forbids evidence of out-of-court assertions to prove the facts asserted in them. If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay." (Internal quotation marks omitted.) *State* v. *Gordon*, 206 Conn. App. 70, 82, 259 A.3d 676, cert. granted, 339 Conn. 913,

262 A.3d 135 (2021). The report is inarguably an out-of-court statement. The report constitutes a statement because it is a written assertion. See id., 83 ("[a] statement is defined as an oral or written assertion" (internal quotation marks omitted)). The statement was also made out of court. Therefore, we must consider the purpose for which the report was admitted.

We conclude that the report was admitted for the truth of the matter asserted. "It is settled law that out-of-court statements that are not offered to establish the truth of the matter asserted are not hearsay. [A]n out-of-court statement offered to prove the truth of the matter asserted is hearsay. . . . If such a statement is offered for a purpose other than establishing the truth of the matters contained in the statement, it is not hearsay." (Internal quotation marks omitted.) *State* v. *Willoughby*, 153 Conn. App. 611, 617–18, 102 A.3d 1118 (2014). In determining whether an out-of-court statement is offered for the truth of the matter asserted, and thus is hearsay, "the matter asserted [is] the matter asserted by the writing or speech, not the matter asserted by the proponent of the evidence." (Internal quotation marks omitted.) *State* v. *Esposito*, 223 Conn. 299, 315, 613 A.2d 242 (1992); see also *State* v. *Williams*, 48 Conn. App. 361, 368–69, 709 A.2d 43 ("[t]he matter asserted [in an out-of-court statement is] the matter asserted by the writing or speech, not the matter asserted by the proponent of the evidence" (internal quotation marks omitted)), cert. denied, 245 Conn. 907, 718 A.2d 16 (1998).

Although the trial court determined that the report was offered by the state only to show that the Norwich Police Department took action with regard to Marceau's performance during the investigation of the case, the matter asserted in the report relates to the investigation of this case and the quality of Marceau's work on the case. The first page of the report asserts that Marceau's work on the case was unsatisfactory. Although the second page of the report was subject to redactions, the matter asserted on the second page is that Marceau's initial determination that the incident was a suicide attempt was incorrect and that Marceau's actions leading him to that conclusion were inadequate. Thus, the report was introduced to prove that Marceau's investigation and conclusion that the incident was a suicide attempt were inadequate and unsatisfactory. For these reasons, we conclude that the report was introduced to prove the truth of its contents.

Having determined that the report constituted hearsay, we next determine whether the report was admissible under a hearsay exception. As detailed previously, the state argued at trial that the report was admissible under the business record exception. Because the trial court concluded that the report was not hearsay, it did not make an explicit finding concerning whether the

report fell under the business record exception. "[H]earsay may be admitted if there is a sufficient probability that the statement is reliable and trustworthy, if the evidence contained in the statement is necessary to resolution of the case, and if the trial court concludes that admitting the statement is in the interests of justice. . . . Some types of admissible hearsay occur frequently enough that certain defined exceptions to the general rule of inadmissibility have come to be recognized." (Citation omitted; internal quotation marks omitted.) *State* v. *Sharpe*, 195 Conn. 651, 664, 491 A.2d 345 (1985). One such exception is the business record exception set forth in General Statutes § 52-180.[9]

"To admit evidence under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in . . . § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." (Internal quotation marks omitted.) *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 793–94, 595 A.2d 839 (1991).

The state failed to establish that the report in this case was made in the regular course of business, instead of in anticipation of litigation. "The business record exception recognizes that documents used for business are trustworthy. Those prepared for litigation, however, lack the presumption of trustworthiness." *Connecticut Bank & Trust Co., N.A.* v. *Reckert*, 33 Conn. App. 702, 710, 638 A.2d 44 (1994). "[D]ocuments prepared for litigation are excluded, not on a per se basis, but rather upon an inquiry into whether such documents bear circumstantial indicia of lack of trustworthiness. In the exercise of appropriate discretion, courts may exclude such records where they are self-serving and a motive for falsification can be demonstrated." (Internal quotation marks omitted.) *Webster Bank* v. *Flanagan*, 51 Conn. App. 733, 749, 725 A.2d 975 (1999). We conclude that the report here lacks trustworthiness. The report was made on January 7, 2017, after the defendant had been arrested, but before the commencement of his trial. The report was also made three months after the actions described in it. Because the report was made after the defendant's arrest and three months after the events it describes, it does not have the indicia of trustworthiness required to fall within the business record exception. We therefore conclude that the report constitutes inadmissible hearsay and does not fall under the business record exception.

The defendant also claims that the admission of the report violated his right to confront the witnesses against him. "[T]he state's use of hearsay evidence

against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. This right is secured for defendants in state criminal proceedings. . . . [T]he primary interest secured by confrontation is the right of cross-examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 816, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "The confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 636 n.4, 945 A.2d 449 (2008). Article first, § 8, of the Connecticut constitution also provides that a defendant has the right "to be confronted by the witnesses against him . . . ." Conn. Const., art. I, § 8. "[O]ur Supreme Court has interpreted Connecticut's confrontation clause to provide the same protections as its federal counterpart. . . . [W]ith respect to the right to confrontation within article first, § 8, of our state constitution, its language is nearly identical to the confrontation clause in the United States constitution. The provisions have a shared genesis in the common law. . . . [T]he principles of interpretation for applying these clauses are identical." (Internal quotation marks omitted.) *State* v. *Hutton*, 188 Conn. App. 481, 500 n.8, 205 A.3d 637 (2019).

The initial inquiry to determine whether the defendant's right to confrontation was violated is whether the hearsay statement is testimonial in nature. See *State* v. *Lahai*, 128 Conn. App. 448, 468, 18 A.3d 630 ("the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature" (internal quotation marks omitted)), cert. denied, 301 Conn. 934, 23 A.3d 727 (2011). "A police report is a quintessential example of an extrajudicial statement contained in a formalized testimonial material. It is signed by the attesting officer under penalty of law. It is prepared with an eye toward prosecution . . . and it is inherently accusatory. . . . The primary purpose of a police report is to establish or prove past events potentially relevant to later criminal prosecution." (Citations omitted; internal quotation marks omitted.) Id., 469. Here, we find that the report was testimonial in nature because its purpose was to establish that Marceau's work on the present case and conclusion that the incident under investigation was a suicide attempt rather than a criminal assault was inadequate and unsatisfactory. The report suggests that Lovering was assaulted—a fact relevant to the defendant's prosecution. The statements in the report were "made under circumstances which would lead an objective witness reasonably to believe

that the statement would be available for use at a later trial . . . .'' (Internal quotation marks omitted.) Id., 470–71.

In *Crawford* v. *Washington*, supra, 541 U.S. 68, the United States Supreme Court held that "*testimonial* hearsay statements may be admitted as evidence against an accused at a criminal trial only when (1) the declarant is unavailable to testify, and (2) the defendant had a prior opportunity to cross-examine the declarant." (Emphasis in original; internal quotation marks omitted.) *State* v. *Carpenter*, supra, 275 Conn. 817. Here, the state did not introduce any evidence that (1) Lazzaro, who prepared the report, was unavailable to testify at trial, and (2) the defendant had a prior opportunity to cross-examine Lazzaro. Therefore, we conclude that the trial court improperly admitted the report into evidence in violation of the defendant's right to confront witnesses against him.

We do not determine whether admission of the report into evidence was harmless error. See *State* v. *Raynor*, 337 Conn. 527, 561 n.20, 254 A.3d 874 (2020) ("The state also contends that any error in this regard was harmless. Because we address this claim as an issue likely to arise on remand, we need not address questions of harmless error [with respect to this claim] in the present appeal.").

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] For clarity and ease of discussion, we have reordered the claims from how they are set forth in the defendant's brief.

[2] In 2013, it was determined that the defendant was autistic. At trial, defense counsel argued that any inconsistencies in the defendant's statements and his odd mannerisms could be explained by his autism.

[3] The jury did not consider, and the trial court dismissed, a charge of assault in the second degree in violation of General Statutes § 53a-60 (a) (1).

[4] Autoerotic asphyxiation is "the practice of limiting the flow of oxygen to the brain during masturbation in an effort to heighten sexual pleasure." *Critchlow* v. *First UNUM Life Ins. Co. of America*, 378 F.3d 246, 250 (2d Cir. 2004).

[5] Connecticut Criminal Jury Instruction 2.6-14, titled "Adequacy of Police Investigation," was approved by the Judicial Branch's Criminal Jury Instruction Committee on November 6, 2014. That instruction, as it existed at the time of the charge conference, provided: "You have heard some arguments that the police investigation was inadequate and that the police involved in this case were incompetent. The issue for you to decide is not the thoroughness of the investigation or the competence of the police. The only issue you have to determine is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt the defendant is guilty of the count[s] with which (he/she) is charged." See *State* v. *Gomes*, supra, 337 Conn. 834 n.7.

The commentary to instruction 2.6-14 provided: " 'A defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect.' *State* v. *Collins*, [supra, 299 Conn. 599–600] (finding that such an instruction as this does not preclude the jury from considering the evidence of the police investigation as it might relate to any weaknesses in the state's case). 'Collins does not require a court to instruct the jury on the quality of police investigation, but merely holds that a court may not preclude such evidence and argument from being presented to the jury for its consideration.' *State*

v. *Wright*, 149 Conn. App. 758, 773–74, [89 A.3d 458] cert. denied, 312 Conn. 917 [94 A.3d 641] (2014)." See *State* v. *Gomes*, supra, 337 Conn. 834–35 n.7.

[6] This instruction was subsequently approved by the Judicial Branch's Criminal Jury Instruction Committee as 2.6-14, titled "Adequacy of Police Investigation." Connecticut Criminal Jury Instructions 2.6-14, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited January 19, 2022).

[7] In *Gomes*, the court made clear that "[t]he language used in the model jury instructions, although instructive in considering the adequacy of a jury instruction . . . is not binding on this court. . . . [W]e previously have cautioned that the . . . jury instructions found on the Judicial Branch website are intended as a guide only, and that their publication is no guarantee of their adequacy." (Citation omitted; internal quotation marks omitted.) *State* v. *Gomes*, supra, 337 Conn. 853 n.19.

[8] Although our conclusion in part I of this opinion is dispositive of the present appeal, we address the defendant's claim that the trial court improperly admitted the police disciplinary report because it has been raised and fully briefed, and it is likely to arise on remand. See, e.g., *State* v. *Chyung*, 325 Conn. 236, 260 n.21, 157 A.3d 628 (2017) (addressing claim that court abused its discretion in admitting evidence of uncharged misconduct because issue was likely to arise on remand).

[9] General Statutes § 52-180 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."